COX FRICKE
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOACHIM P. COX          7520-0
ROBERT K. FRICKE        7872-0
ABIGAIL M. HOLDEN       8793-0
800 Bethel Street, Suite 600
Honolulu, Hawai'i 96813
Telephone: (808) 585-9440
Facsimile: (808) 275-3276

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| PAULA ALDIS and Command Master Chief CHRISTOPHER ALDIS, USN, Individually and as Next Friends of Their Minor Child, K.A.<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL NO. _____<br>(Federal Tort Claims Act)<br><br>COMPLAINT; SUMMONS |

## COMPLAINT

Plaintiffs PAULA ALDIS and Command Master Chief

CHRISTOPHER ALDIS, USN, Individually and as Next Friend of their minor

child, K.A. (hereinafter collectively "Plaintiffs"), by and through their attorneys,

Cox Fricke LLP, and for a Complaint against the above-named Defendant

UNITED STATES OF AMERICA ("Defendant"), allege and aver as follows:

<u>PARTIES</u>

1.     This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671, et. seq. ("FTCA").  Defendant is named as defendant pursuant to and under the provisions of the FTCA.

2.     At all times material herein, Plaintiff PAULA ALDIS ("Paula") resided in Kailua, Hawaiʻi, in the City and County of Honolulu, State of Hawaiʻi. Plaintiff Command Master Chief CHRISTOPHER ALDIS, USN ("Chris") was and is Paula's husband and also resided in Kailua, Hawaiʻi, in the City and County of Honolulu, State of Hawaiʻi.

3.     Minor Plaintiff K.A. is the child of Paula and Chris and at all times material herein, was and is currently residing in Kailua, Hawaiʻi, in the City and County of Honolulu, State of Hawaiʻi.

4.     Paula and Chris bring this lawsuit in their individual capacities and as Next Friends of K.A..

5.     Upon information and belief, at all times material herein, Defendant operated Tripler Army Medical Center ("TAMC"), which is located in Honolulu, Hawaiʻi.

6.     At all relevant times, the TAMC personnel (including persons employed by Defendant and/or other employees, agents and/or contractors for which Defendant was responsible and/or vicariously liable) who performed the

negligent acts described herein and/or who injured Plaintiffs through their

negligence, were acting within the course and scope of their employment.

## JURISDICTION AND VENUE

7.     TAMC is a "Federal agency" of Defendant USA, in accordance

with 28 U.S.C. § 2671.

8.     In accordance with 28 U.S.C. § 2675, on or about February 5,

2016, each of the Plaintiffs submitted administrative claims (Standard Forms 95) to

TAMC within the statutory period prescribed by the FTCA.  Defendant

acknowledged receipt on or about February 9, 2016.

9.     More than six months have passed without a final determination

of the administrative claims submitted to TAMC, and therefore this suit is timely

filed pursuant to the provisions of the FTCA.

10.     This Court has exclusive jurisdiction under 28 U.S.C. § 1346(b)

for claims made pursuant to 28 U.S.C. §§ 2671-2680.

11.     Venue is proper as the acts or omissions giving rise to the

claims occurred in Honolulu, Hawaiʻi.

## GENERAL ALLEGATIONS

12.     The events giving rise to this Complaint occurred in July and

August 2014 when Paula was a patient of TAMC.

13.    Prior to that time, Paula was a fit, motivated, compassionate, fun-loving and adventurous 49-year-old woman, mother and wife.  She had previously been diagnosed with kidney disease and Type I diabetes, but those conditions were controlled.  She saw her endocrinologist regularly, used an insulin pump to control her blood sugar, ate healthy and was very active.

14.    In July 2014, upon evaluation for some feelings of gastric fullness, it was discovered that Paula had a mass on her left kidney.  The decision was made that TAMC would perform a partial nephrectomy (partial kidney removal) rather than a total nephrectomy, so as to preserve as much kidney function as possible.

15.    On Monday, July 24, 2014, Paula underwent the partial nephrectomy at TAMC, which took just over four hours.  Intraoperatively, near the end of the procedure, a TAMC anesthesiologist had administered an epidural of certain narcotic pain medications, but because Paula developed significant hypotension, the epidural was stopped.  TAMC then gave Paula Phenylephrine to maintain her mean arterial blood pressure ("MAP") > 65.  Paula was transported to the post-anesthesia care unit ("PACU") in stable condition.

16.    The partial nephrectomy procedure had gone as expected and there were no surgical complications.  TAMC told Chris that she should be out of the hospital in a few days.

4

17.     Upon her arrival in the PACU, Paula remained hypotensive.  To maintain her blood pressure MAP > 65, a TAMC nurse anesthetist (CRNA) was reported to have administered IV boluses totaling 300 mcg of Phenylephrine at the bedside during Paula's PACU stay.  Paula's postoperative blood count also decreased.

18.     Given Paula's hypotension and the need for the continual bolus of intravenous Phenylephrine to maintain Paula's MAP > 65, it is unclear why TAMC chose to continue to administer the Phenylephrine peripherally rather than consider inserting a central line while Paula was in the PACU.

19.     After about 50 minutes in the PACU, TAMC transported Paula to the Intensive Care Unit ("ICU") for close monitoring of her blood sugar and low blood pressure.  Upon her arrival in the TAMC ICU, Paula was started on a continuous intravenous Phenylephrine drip at 10 mcg/min at 1600.

20.     Chris was able to see Paula in the ICU.  Whereas TAMC told him that the procedure had gone well, he left to go home to care for K.A.  He told K.A. that he was told her mother was doing great and the TAMC doctors were confidant that they had removed any potential cancer.

21.     After Paula was admitted to the ICU, TAMC did not monitor Paula's vital signs in accordance with the documented postoperative order of vital signs every 15 minutes x 2 hours.  The ICU nursing staff did not follow acceptable

postoperative nursing standards of vital sign checks every 15 mins x 4, then every

30 mins x 2.  The ICU nursing staff did not follow acceptable critical care nursing

standards of care of taking vital signs every 15 minutes (at a minimum) when

vasoactive medications are being uptitrated (here, the Phenylephrine was being

uptitrated in an attempt to maintain Paula's MAP > 65).  The Phenylephrine IV

drip was initiated at 1600 in the ICU.  Paula's MAP was documented to be 58 at

1700 so the IV Phenylephrine drip was increased.  Paula's documented blood

pressure at 1855 was 65/49 and 54/29.  Her BP at 1900 was  65/46 and 54/29.  The

medical records indicate Paula's vital signs in the ICU were only taken at 1630,

1700, 1800, 1855, 1900, and 2000.

22.     While in the ICU, TAMC made the decision to place a Right

Internal Jugular ("IJ") central line and/or CVC ("central venous catheter") so that

TAMC could give Paula blood pressure medication (Levophed) intravenously.

23.     TAMC told Paula that she needed to sign a consent form for

them to place the IJ line.  Paula was hypotensive and was still coming out of the

effects of anesthesia.  Paula remembers TAMC just putting a piece of paper in

front of her and telling her to sign it.  Paula told TAMC that she could not read the

words on the page, but TAMC told her to make an "X."  Paula could not read or

comprehend any part of it, and simply placed her initials on the form at TAMC's

direction.  Paula does not remember TAMC discussing the content of the form with her, or any information regarding the nature or risks of the procedure.

24.     TAMC was aware that Chris had a Power of Attorney ("POA") for healthcare for his wife.  However, TAMC did not contact Chris for his consent to the procedure.

25.     TAMC's records indicate that a TAMC Junior Resident attempted to place the central line without an attending, anesthesiologist or senior resident supervising the procedure.

26.     When the TAMC Junior Resident was placing the central line, Paula heard words to the effect of, "I've never done one before."   The TAMC Junior Resident then repeatedly attempted (and failed) to place the central line.

27.     During the continual failed attempts to place the line, Paula experienced horrible stabbing pain in her neck and asked repeatedly for the TAMC Junior Resident to stop because it hurt so badly.

28.     After no blood was able to be aspirated from the line, the TAMC Junior Resident used ultrasound, which showed that the line had not been placed in the IJ.

29.     The TAMC Junior Resident did not utilize proper procedures and techniques when performing the procedure, including but not limited to, proper patient positioning, how to identify and appreciate the anatomical markers before

and during line placement, the appropriate positioning of the patient for needle insertion, and the use of proper aids and techniques to distinguish between vein and artery, including the use of ultrasound, probes or other pressure monitoring devices.

30.     There was no attending physician present and/or supervising during the procedure.

31.     It was later discovered that during these unsuccessful attempts to place the central line, that TAMC had lacerated Paula's right subclavian artery in three places, causing massive internal bleeding.

32.     After the TAMC Junior Resident's multiple unsuccessful attempts to insert the central line properly, and after having caused major damage to Paula's subclavian artery, a TAMC anesthesiologist entered the room to check Paula's epidural when the TAMC Junior Resident asked for assistance in placing the line.  The anesthesiologist removed the central line that the Junior Resident was attempting to insert into Paula's right internal jugular (RIJ) vein.  Under ultrasound guidance, the TAMC anesthesiologist was able to place the RIJ central line on the first try without any difficulty or problem.

33.     After the line was inserted, TAMC ordered a stat post-insertion chest x-ray to confirm line placement.  At 7:00 p.m., Paula's blood pressure fell to 54/29.

34.    The portable x-ray was obtained at 7:15 p.m., and the radiologist called a TAMC intensivist at 7:52 p.m. to report that the x-ray showed that Paula had a large right-sided effusion or hemothorax (blood pooling in the pleural space, between her chest wall and lung).

35.    There is no indication that any TAMC physicians came to assess why Paula was suddenly so severely hypotensive starting around 7:00 p.m. and before receiving the result of the x-ray at 7:52 p.m.  There is no documentation that TAMC performed a physical assessment of Paula during this time and/or performed any chest auscultation with a stethoscope, which could have provided evidence of Paula's hemothorax and the underlying cause of her severe hypotension.

36.    At this time, Chris was at home with K.A., thinking his wife was doing great and was just being monitored.  Then he got a phone call from TAMC and was told that Paula needed to speak with him immediately.  Paula told Chris that TAMC had done something to her and she was dying.  The TAMC nurse told Chris they were prepping Paula to go back into surgery and to return to TAMC as fast as possible and to make sure to bring K.A.

37.    Paula's condition was deteriorating rapidly.  She experienced marked drop in blood pressure and increase in heart rate, as well as severe chest pain and difficulty breathing.

38.   TAMC initiated a massive transfusion protocol.  Between the time of the central line placement, around approximately 6:00 p.m., and the time the chest tube was inserted, Paula lost approximately 2.5 liters of blood from the punctured right subclavian artery.

39.   TAMC placed a left femoral cordis line and a right chest tube, removing the approximately 2.5 liters of blood, which had accumulated in the pleural space.

40.   TAMC personnel decided they needed to perform an emergency median sternotomy to repair the damage to Paula's right subclavian artery.

41.   When Chris and K.A. arrived at the hospital, TAMC advised that Paula had lost a lot of blood, that TAMC staff needed to resuscitate her, and that she was going to the operating room for emergency cardiothoracic surgery.

42.   Chris and K.A. saw TAMC staff wheel Paula by them and to surgery.  Paula was ashen gray, unconscious, intubated again, and was attached to numerous medical devices.

43.   Intraoperatively, during the emergency median sternotomy procedure, it was discovered that there were three holes in Paula's right subclavian artery caused by TAMC's unsuccessful attempts to place the central line.  TAMC

removed large amounts of blood clots in the right pleural cavity and repaired the frayed holes with a bovine pericardial patch.

44.     After the procedure, TAMC transferred Paula back to the ICU, intubated and sedated.

45.     TAMC advised Chris that Paula's kidneys had been weakened as a result of having to undergo this second emergency procedure.  TAMC also opined that Paula had most likely developed Acute Tubular Necrosis, a kidney disorder, secondary to hypotension.

46.     While recovering in the hospital the next two weeks, Paula experienced numerous unpleasant side effects, including but not limited to, severe pain from the emergency sternotomy and neck incisions, which was excruciating whenever she coughed or moved; pain, tenderness and heaviness in her right arm and some numbness in her hand; muscle spasms in her arms and facial muscles; frequent nausea, dry heaving and vomiting, and poor appetite for several days; frequent diarrhea; hallucinations; severe swelling; and mental and emotional distress.

47.     After 15 days in the hospital, TAMC finally discharged Paula to recover at home.  She was to continue with outpatient rehabilitation and follow-up appointments.

48.     Upon returning home, Paula still had the abdominal drainage tube and fluid in her lungs.  Her breathing was labored, sleep was difficult, and she was in  significant pain.

49.     Paula has continued to experience chronic pain.  Her quality of life has been substantially worsened as a result of what was supposed to be a routine kidney surgery.

50.     She has experienced right arm heaviness and hand paresthesis, pain in her neck, lower ribs, hip flexors, and generalized chronic joint and bone pain.

51.     The incident has also negatively impacted Paula's mental and emotional state.  Among other things, she has experienced anger, depression and emotional distress.

52.     Further, Paula cannot escape the permanent reminders of this terrible experience.  She has several large scars, including: (1) a long scar from the sternotomy; (2) a large scar on the right side of her neck where the central line was placed; (3) abdominal scars from femoral lines; and (4) a scar underneath her right armpit (shape of an X).

53.     Paula has also experienced continuing renal problems. Preoperatively, Paula had pre-existing renal insufficiency but stable renal function, chronic kidney disease (CKD) stage 3, with creatinine level of 1.3 for more than

10 years.  The decision had been made to proceed with the partial nephrectomy, as opposed to a total nephrectomy, to remove the mass while also preserving as much kidney function as possible.  TAMC's negligence, however, defeated this purpose and benefit of the partial nephrectomy.

54.    As a result of the second emergency surgery required to repair the damage to Paula's right subclavian artery caused by TAMC's improper central line placement, Paula experienced prolonged hypotension, severe anemia, and was given high dose vasoactive medications.  This took a toll on her kidneys/pre-existing renal insufficiency.  Paula's creatinine level and GFR rate has since worsened considerably.  She is now CKD stage 5 with a creatinine above 3.

55.    Given Paula's declining kidney function resulting from the severe hypovolemia, severe hypotension, and profound anemia that resulted from the lacerated right subclavian artery during the improper central line insertion attempts by a TAMC Junior Resident, Paula is now also at a greater risk for early dialysis, potential kidney failure, and a kidney transplant.  Paula is currently in the process of being added to a Department of Defense kidney transplant waitlist.

## COUNT I
(Medical Negligence/Malpractice as to Paula)

56.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 55, as though fully set forth herein.

57.     At all relevant times, all members of the TAMC medical staff involved in the negligent acts described herein were employed by Defendant and/or were employees, agents and/or contractors for which Defendant was responsible and/or vicariously liable.

58.     At all times relevant hereto, Defendant owed a duty to Paula to exercise that degree of care, skill, knowledge, experience and diligence ordinarily exercised by such health care providers in the application of their skills and the performance of their profession under similar circumstances.

59.     Defendant, by and through TAMC and its employees and agents, breached this duty of care through the actions described above.  This includes, but is not limited to, Defendant's failure to utilize several of the prevailing techniques and methods recognized by the medical community when placing the central line; negligence in puncturing Paula's right subclavian artery and the uncontrolled hemorrhage that resulted from its attempted placement and removal; failing to properly monitor Paula's vital signs while she was in the ICU following the partial nephrectomy; failing to assess the cause of Paula's hypotension after the central line was inserted and before receiving chest x-ray results; and/or failing to properly train and/or supervise its employees and agents, including its Junior Residents, when placing the line and as to the appropriate methods and techniques required to place the line successfully.

14

60.     As a direct proximate and legal cause of Defendant's negligence, Paula has suffered and is entitled to recover compensation for her significant injuries and great physical pain and suffering, depression and mental anguish, emotional distress, permanent disfigurement, past and future loss of enjoyment of life, and for the cost of past and future medical and rehabilitative care.  Also as a direct proximate and legal cause of Defendant's negligence, Paula is now at a greater risk for early dialysis, potential kidney failure and a kidney transplant.

61.     As a result of Defendant's breaches, Paula has suffered economic and non-economic damages in an amount to be determined at trial.

## COUNT II
### (Negligent Failure to Obtain Informed Consent)

62.      Plaintiffs reallege and incorporate by reference paragraphs 1 through 61, as though fully set forth herein.

63.     Defendant owed Plaintiffs a duty of disclosure pursuant to Hawai'i Revised Statutes ("HRS"), Section 671-3(b) as to the procedure of placing the central line.

64.     Defendant, by and through TAMC and its employees and agents, breached this duty and did not obtain the informed consent of Paula and/or Chris (on behalf of Paula as her POA) before placing the central line.

65.   TAMC did not provide Paula and/or Chris with sufficient and adequate information, as required by HRS Section 671-3(b), such that Paula and/or Chris (on behalf of Paula) could give informed consent to the procedure, including but not limited to the nature of the procedure, recognized alternative procedures, to include femoral placement, and any benefits of such, and/or the material risks of the procedure.

66.   At the time TAMC made the decision that a central line should be placed, Paula was in the ICU, under the effects of postoperative anesthesia, hypotensive and requiring Phenylephrine for blood pressure support.  She lacked the capacity to give informed consent.

67.   TAMC negligently failed to recognize Paula's inability to understand, at that time, what little information was even provided to her and not able to give the necessary informed consent.  Tripler negligently failed to contact Chris, who had a POA for healthcare for his wife, to provide him with the required information.

68.   A reasonable person in Paula's and/or Chris' position would not have consented to the procedure if properly informed of those items noted herein and that the procedure was going to be performed by a Junior Resident without an attending or other senior physician supervising and/or assisting.

16

69.     Plaintiffs have been damaged as a direct and proximate cause of Defendant's negligence.

## COUNT III
(Negligent Infliction of Emotional Distress and Loss of Consortium as to Chris)

70.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 69, as though fully set forth herein.

71.     As a direct proximate and legal cause of Defendant's negligence, Chris has suffered and is entitled to recover compensation for his serious mental and emotional distress and loss of companionship or consortium due to, among other things, seeing his wife endure the incident at TAMC, her resulting injuries and continual suffering as a result thereof, and experiencing the negative effect it has had on their relationship.

## COUNT IV
(Negligent Infliction of Emotional Distress and Loss of Parental Care and Companionship as to Minor Child K.A.)

72.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 71, as though fully set forth herein.

73.     As a direct proximate and legal cause of Defendant's negligence, K.A. has suffered and is entitled to recover compensation for her serious mental and emotional distress and loss of parental care and companionship due to, among other things, seeing her mother endure the incident at TAMC, her

resulting injuries and continual suffering as a result thereof, and experiencing the negative effect it has had on her relationship with her.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that judgment be entered in their favor against Defendant as follows:

1.     For an award of special and general damages in Plaintiffs' favor and against Defendant in an amount to be determined at trial.

2.     For costs and interest on the judgment.

3.     For such other and further relief as this Court deems just.

DATED: Honolulu, Hawai'i, December 6, 2017.


/s/ Robert K. Fricke
JOACHIM P. COX
ROBERT K. FRICKE
ABIGAIL M. HOLDEN

Attorneys for Plaintiffs
PAULA ALDIS and Command Master
Chief CHRISTOPHER ALDIS, USN,
Individually and as Next Friends of
Their Minor Child, K.A.